# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHRISTIAN HOEDT, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00310** |
| | ) | |
| **VANDERBILT UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Following his summary suspension, temporary loss of medical privileges, and reporting thereof to the National Practitioner Databank ("NPDB"), Dr. Christian Hoedt ("Dr. Hoedt") brought a five-count Amended Complaint ("FAC") against Vanderbilt University ("VU"), Vanderbilt University Medical Center ("VUMC"), Vanderbilt University Medical Center d/b/a Vanderbilt Wilson County Hospital ("VWCH" or the "Hospital"),[1] Dr. Rick W. Wright ("Dr. Wright"), Doctor Gregory G. Polkowski ("Dr. Polkowski," collectively with VUMC, VWCH, and Dr. Wright, the "VUMC Defendants"), and the United States Department of Health and Human Services ("HHS").[2] Before the Court are two motions. First, the VUMC Defendants' Partial Motion to Dismiss (Doc. No. 33) ("VUMC's Motion"), to which Dr. Hoedt has responded in opposition (Doc. No. 40), and the VUMC Defendants have replied. (Doc. No. 43). Second, VU's

---

[1] Despite naming VUMC d/b/a VWCH as a separate defendant, the FAC does not bring a claim against VWCH itself. The Court will therefore construe allegations regarding VWCH as part of claims against VUMC.

[2] The FAC also names Xavier Becerra ("Becerra") in his now-former official capacity as Secretary of HHS but brings no claim against him. The Court will therefore dismiss Becerra *sua sponte* under Rule 21. See Letherer v. Alger Grp., 328 F.3d 262, 267 (6th Cir. 2003), overruled on other grounds by Blackburn v. Oaktree Cap. Mgmt., 511 F.3d 633 (6th Cir. 2008).

Renewed Motion to Dismiss or, in the Alternative, for a More Definite Statement (Doc. No. 38) ("VU's Motion"), to which Dr. Hoedt has responded in opposition (Doc. No. 49), and VU has replied. (Doc. No. 53). For the following reasons, VUMC's Motion will be denied and VU's Motion will be granted.

## I.    FACTUAL ALLEGATIONS[3]

### A.  Parties

Dr. Hoedt is a resident of North Carolina and a "fellowship-trained surgeon specializing in joint replacement." (Doc. No. 29 ¶ 16). He is "licensed to practice" in Tennessee, among other states. (Id. ¶ 1). VU "is a non-profit corporation with its principal place of business . . . in Nashville, [Tennessee]," which "operates a medical school[.]" (Id.). VUMC is "a Tennessee Corporation with its principal place of business in Nashville, Tennessee." (Id. ¶ 3). VWCH "is a wholly owned subsidiary of VUMC," which "operates a hospital . . . in Lebanon, Tennessee." (Id. ¶ 5). Dr. Wright is "the Chief of the Department of Orthopaedic Surgery at VUMC." (Id. ¶ 17). Dr. Polkowski is the Vice-Chair of the same department and Dr. Hoedt's immediate supervisor. (Id. ¶ 2)). Both "[Drs.] Wright and Polkowski are residents of Tennessee." (Id. ¶ 3). HHS "is a federal agency headquartered in Washington, D.C." (Id. ¶ 6).

### B.  Background Facts

On January 25, 2021, Dr. Hoedt entered into a contract ("Employment Agreement") with VU and VUMC.[4] Dr. Hoedt attached a written copy of the Employment Agreement to the original

---

[3] Unless indicated otherwise, the relevant background and facts necessary to resolve the pending Motions are drawn only from the FAC. (Doc. No. 29). They are accepted as true for purposes of ruling on the Motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[4] The FAC states that the contract is "dated January 15, 2021," but mentions that Dr. Hoedt's acceptance occurred on January 25, 2021. (Id. ¶ 17). The Court will construe these allegations as stating that the January 15, 2021, document was an offer, which Dr. Hoedt accepted on January 25, 2021.

complaint in this case. (Doc. No. 1-1). The FAC incorporates the Employment Agreement by reference.[5] (See Doc. No. 29 ¶ 17). Under the Employment Agreement, Dr. Hoedt was to serve a two-year term as both a faculty member at VU's medical school and practicing physician at VUMC's recently acquired VWCH facility. (Id.). The Employment Agreement contains a provision granting VU and VUMC a right of early termination for cause if Dr. Hoedt loses his medical privileges at VWCH. (Id. ¶ 23).

At VWCH, Dr. Polkowski allegedly pressured Dr. Hoedt to use medical equipment sold by a manufacturer that would compensate Dr. Polkowski and others within the department for such use. (Id. ¶¶ 19–20). Among other things, the manufacturer would provide "lavish entertainment and gifts." (Id. ¶ 20). Dr. Hoedt refused to accept gifts from the manufacturer because he considered them to be "probably illegal, in violation of VU's policies, and certainly unseemly." (Id.). Further, finding that the equipment was sub-par, Dr. Hoedt "made it clear to that manufacturer's representative that he would no longer be using" the equipment. (Id.). Shortly thereafter, "Dr. Hoedt was informed by personnel at VWCH that a threat was made by the representative that if Dr. Hoedt did not use [the manufacturer's equipment], 'he w[ould] not be around very long.'" (Id.). "Within several days," Drs. Wright and Polkowski met with Dr. Hoedt and informed him "for the first time that his surgical abilities were wanting and that they would not be renewing [the Employment Agreement]." (Id. ¶ 21). After the meeting, Drs. Wright and

---

[5] In the FAC, Dr. Hoedt repeatedly incorporates by reference critical documents pertaining to his claims. (See, e.g, Doc. No. 29 ¶¶ 17, 31, 56). This practice is in violation of L.R. 15.01(b), which requires that amended pleadings "restate the entirety of the pleading with amendments *incorporated*, rather than merely reciting amended sections." Id. (emphasis added). Because the parties all understand Dr. Hoedt's incorporated references here, the Court will not strike those portions of the FAC. Still, the Court cautions Dr. Hoedt to not continue this practice in future filings.

Polkowski "began pressuring Dr. Hoedt to terminate [the Employment Agreement] and find employment elsewhere," but Dr. Hoedt refused. (Id. ¶ 22).

Approximately a month after the meeting, "Dr. Hoedt was informed by the VWCH Chief of Staff that his privileges at the hospital [had been] summarily suspended due to the unexpected death of one of his patients" the day before. (Id. ¶ 23). This summary suspension "started" a peer-review process.[6] (Id. ¶ 30). According to the FAC, "[a] summary suspension under [VWCH's] bylaws could only be imposed if there [was] an imminent danger to patient safety[.]" (Id. ¶ 23). The FAC further alleges that the suspension was the result of "accusations" by Dr. Wright, who "misrepresented the standard of care" allegedly violated by Dr. Hoedt and falsely claimed that the patient's death was caused by Dr. Hoedt's surgery. (Id. ¶¶ 23–24). Specifically, VWCH told Dr. Hoedt that his use of hydrogen peroxide to clean the patient's wound was "a gross deviation from the [applicable] standard of care[.]" (Id. ¶ 24). Dr. Hoedt researched the question and, based upon "a variety of peer reviewed literature," concluded that the use of hydrogen peroxide was proper. (Id. ¶ 25). Dr. Hoedt informed VWCH that the procedure could not have caused the patient's death, "produced an extensive list of literature," and requested an independent evaluation, which "was rejected." (Id.)

Under the impulse of Dr. Wright, VWCH upheld the summary suspension and voted for the total revocation of Dr. Hoedt's medical privileges based upon "complication[] and infection rates" as well as misrepresentations by Drs. Wright and Polkowski that "remediation efforts" had been unsuccessful. (Id. ¶ 25). But, according to the FAC, no such efforts ever occurred. (Id.)

---

[6] The peer-review process is central to Dr. Hoedt's claims, but the FAC does not describe it.

C.  Settlement Agreement

In response to the summary suspension of his medical privileges, Dr. Hoedt "exercised his right to a hearing" and informed "VUMC and VWCH that he was willing to undergo a proctoring arrangement to demonstrate his competency." (Id. ¶ 27). VWCH did not provide timely notice of the charges to Dr. Hoedt following his request for a hearing, which the FAC describes as a violation of VWCH's bylaws. (Id. ¶ 27). The parties ultimately entered into a settlement agreement ("Settlement Agreement") (Doc. No. 1-1), which is attached to the original complaint and incorporated by reference in the FAC. (See Doc. No. 29 ¶ 31). The parties agreed to the proctoring arrangement and that Dr. Hoedt would resign his privileges at VWCH, not exercise his remaining privileges at other VUMC facilities, and release claims stemming from VWCH's peer-review process. (Id. ¶ 34). The FAC alleges that Dr. Hoedt's assent to this arrangement was compelled by "extreme economic and professional duress," insofar as he was "doing everything possible to save his career, which would have been ruined had his privileges been revoked . . . and [the] revocation permanently displayed on the [NPDB] upon becoming final." (Id. ¶ 34).

The FAC alleges that "VUMC was not interested in whether Dr. Hoedt was a competent surgeon" because the real reason for his removal was that he did not want to use medical equipment provided by the manufacturer. (Id. ¶ 35). Nonetheless, Dr. Hoedt successfully completed the proctoring arrangement, which led VWCH to vacate the summary suspension and reinstate his medical privileges. (Id. ¶ 36). During the proctoring, Dr. Hoedt witnessed several doctors in his department use hydrogen peroxide "in the same manner he had used it and in a manner that Dr. Wright had claimed was a gross deviation from the standard of care." (Id.)

D.  Faculty Handbook

Dr. Hoedt "pursued his rights . . . as set forth in [VU's] Faculty Handbook," which the FAC alleges was part of the Employment Agreement. (Id. ¶¶ 37, 56). Specifically, on July 15,

2022, Dr. Hoedt filed a written grievance pursuant to procedures set forth in the faculty handbook ("Handbook"). (Id. ¶¶ 57–61). "[T]hrough November," Dr. Hoedt also submitted multiple "[l]engthy written and oral complaints" regarding the allegedly ongoing "unethical and fraudulent behavior of [Drs.] Wright and Polkowski" and alleged violations of VU's policies. (Id.). On November 21, 2022, Dr. Hoedt submitted an "additional grievance" regarding the conduct of Drs. Wright and Polkowski. (Id. ¶¶ 61–62). "VU breached its agreement by failing to follow its Faculty Handbook and after being fully informed of the unethical and fraudulent behavior of Wright and Polkowski, including the blatant violation of VU's policies[,] VU never investigated Dr. Hoedt's complaints and erroneously concluded his complaint was not timely[.]"[7] (Id. ¶ 38). Specifically, "[i]nstead of performing any investigation . . . the VU faculty committee dismissed Dr. Hoedt's complaints as being untimely, in violation of the policies and procedures outlined in VU's Faculty Handbook." (Id. ¶ 63). The FAC further alleges that VU "erroneously interpreted the Faculty Handbook in an obvious effort to sweep the egregious behavior of Wright, Polkowski, and others on the faculty of [VU's medical school] under the rug." (Id. ¶ 64).

   E.   Reports to the National Practitioner Data Bank

       VUMC and VWCH allegedly filed reports about Dr. Hoedt's suspension with the NPBD. (Id. ¶¶ 39–43). The NPDB is a reporting entity regulated by HHS. (Id.) According to the FAC, HHS has "created an administrative procedure to challenge reports." (Id.). This procedure is allegedly governed by various regulations and administrative guidelines ("Guidelines"). (Id. ¶ 39). The FAC sets forth the following language from the Guidelines:

_____

[7] The FAC is inconsistent on whether VU found one or multiple complaints to be untimely. (Compare id. ¶ 38 (using the singular) with id. ¶ 61 (using the plural)). It is also unclear whether the FAC alleges that the written grievances were the, or one of the, complaints VU dismissed as untimely.

Clinical privileges actions are reportable once they are made final by the health care entity. However, summary suspensions lasting more than 30 days are reportable *even if* they are not final.

If the authorized hospital committee or body vacates the summary suspension, the entity must void the previous report submitted to the NPDB.

If, as a result of a professional review action related to professional competence or conduct, a proctor is required in order for a physician or dentist to proceed in freely exercising clinical privileges, and the period lasts longer than 30 days, the action must be reported to the NPDB. In other words, if, for a period lasting more than 30 days, the physician or dentist cannot perform certain procedures without proctor approval or without the proctor being present and watching the physician or dentist, the action constitutes a restriction of clinical privileges and must be reported.

(Id. ¶ 42).

VWCH submitted multiple reports, which the FAC claims should be voided as contrary to the Guidelines as well as "because the underlying peer review was conducted with malice, in bad faith, and for ulterior motives." (Id. ¶ 49). Specifically, VWCH submitted a first report on July 8, 2022, stating:

Dr. Hoedt's clinical privileges and medical staff membership with Vanderbilt Wilson County Hospital were suspended for concerns regarding his clinical performance including an increased volume of surgical site infections and patient safety, selection, and management. The MEC continued the suspension and made a recommendation for the revocation of Dr. Hoedt's clinical privileges. Dr. Hoedt timely requested a fair hearing to challenge the bases of the suspension and recommendation for revocation. The fair hearing proceedings are pending scheduling.

(Id. ¶ 43). The FAC alleges that this report is wrong because the stated reason for the summary suspension is inaccurate, insofar as the actual reason was the death of a patient. (Id. ¶¶ 44, 47). The FAC also alleges that the report "must be voided under the Guidelines" because the summary suspension was vacated and privileges were restored. (Id. ¶ 47).

A second report, dated September 12, 2022, states in relevant part that "Dr. Hoedt exercised his due process rights by participating in mediation which resulted in the hospital requiring an

agreed upon proctoring program at Vanderbilt University Medical Center to take place between September 26, 2022 and March 16, 2023." (Id. ¶ 45). According to the FAC, the proctoring was not reportable because it only lasted two weeks and ended on October 2, 2022. (Id. ¶ 46). Lastly, the FAC mentions a third report dated December 9, 2022, which allegedly describes "the successful completion of proctoring and the reinstatement of Dr. Hoedt's privileges." (Id. ¶ 48). According to the FAC, this third report is "unnecessary with the voiding of the two prior reports." (Id.).

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When determining whether the complaint meets this standard, the Court must accept all of the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). Moreover, the Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232 (1974)). And "[w]hile the complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Blackwell, 979 F.3d at 524 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." Com. Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir.

2007) (citing Fed. R. Civ. P. 10(c)); <u>Hall v. Trump</u>, 2020 WL 1061885, at *1 (M.D. Tenn. Mar. 5, 2020) (same)).  The same is true for documents "incorporated by reference into the complaint." <u>Knapp v. City of Columbus</u>, 93 F. App'x 718, 720 (6th Cir. 2004) (citing <u>Amini v. Oberlin College</u>, 259 F.3d 493 (6th Cir. 2001)).  Here, the FAC incorporates by reference the Employment Agreement and Settlement Agreement, which are attached to the original complaint.  (<u>See</u> Doc. No. 29 ¶¶ 17, 31).  Therefore, the Court will consider them in deciding the pending Motions.

## III.  VUMC'S MOTION

The FAC contains five counts: breach of the Employment Agreement against VUMC (Count I), breach of the Employment Agreement against VU (Count II), inducement to breach of the Employment Agreement against Drs. Wright and Polkowski (Count III), breach of the Settlement Agreement against VUMC (Count IV), and violation of section 706(2)(A) of the Administrative Procedure Act ("APA") against HHS (Count V).

The VUMC Defendants have moved to dismiss Counts I, III and IV.  The Court will address each of these counts in turn.  For the reasons stated below, the Court will deny VUMC's Motion.

### A.  <u>Breach of the Employment Agreement (Count I)</u>

The VUMC Defendants argue that the FAC fails to state a breach of the Employment Agreement because Dr. Hoedt released any such claim through a general release in the Settlement Agreement.  (<u>See</u> Doc. No. 34 at 7–17).  Dr. Hoedt counters that he entered into the Settlement Agreement under economic duress (Doc. No. 40 at 5–10); that the release does not apply because VUMC breached the Settlement Agreement (<u>id.</u> at 3–5); and the claims at issue do not fall within the purview of the release.  (<u>Id.</u> at 2–3).  The Court will examine Dr. Hoedt's duress argument first because a finding in his favor could moot the remaining arguments on this count and/or affect the Court's analysis on Count IV.

1. Economic Duress

Under Tennessee law,[8] economic duress consists in the "imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another[.]" Crocker v. Schneider, 683 S.W.2d 335, 338 (Tenn. Ct. App. 1984). "A contract signed under economic duress is voidable by the victim, not void." Cumberland & Ohio Co. of Tex. v. First Am. Nat. Bank, 936 F.2d 846, 850 (6th Cir. 1991) (distinguishing economic from physical duress under Tennessee law). "The alleged coercive event must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a person of ordinary firmness." Id. (citing Fogg v. Union Bank, 63 Tenn. 530, 535 (1874)).

The VUMC Defendants first argue that the FAC's allegation of economic duress is insufficient to overcome the Settlement Agreement because the Settlement Agreement was reached through mediation. (See Doc. No. 34 at 15–16; Doc. No. 43 at 4–5). In support of their argument, the VUMC Defendants cite Golden v. Hood, 2000 WL 122195, at *2 (Tenn. Ct. App. Jan. 26, 2000). There, the Tennessee Court of Appeals found that the plaintiff's claim that his attorney threatened to withdraw if he did not accept a settlement agreement was insufficient to establish a *prima facie* case of duress. Id. The remainder of the case, which the VUMC Defendants rely on, is inapposite because it discusses fraud, not duress. See id. at *2–3. The VUMC Defendants do not cite any other authority in support their argument that a settlement agreement reached through mediation could not be compelled by duress. And the Court had no trouble finding authority to the contrary. See, e.g., Chambers v. Tenn. Fair Hous. Council, 2013 WL 652535, at *3 (M.D. Tenn. Feb. 21, 2013), report and recommendation adopted in relevant part,

---

[8] The parties cite exclusively Tennessee law in support of their respective arguments on the issue of economic duress. (See Doc. No. 34 at 14–17; Doc. No. 40 at 5–10; Doc. No. 43 at 4–5). Because there is no dispute as to the applicable law, the Court will apply Tennessee law.

2013 WL 1284333 (M.D. Tenn. Mar. 28, 2013) (recommending dismissal based upon the plaintiff's allegation that she engaged in mediation and released claims against the defendant under economic duress); see also Murphy v. Inst. of Int'l Educ., 32 F.4th 146, 153 (2d Cir. 2022) (analyzing duress with respect to a settlement agreement reached through mediation); Thomas v. Sandstrom, 459 F. App'x 93, 95 (3d Cir. 2012) (same). Therefore, the Court rejects the argument that the Settlement Agreement reached through mediation is not actionable.

Next, the VUMC Defendants argue that the FAC alleges no facts demonstrating coercion, and that the existing allegations only show that Dr. Hoedt entered into the Settlement Agreement pursuant to his free will. (See Doc. No. 34 at 16). The Sixth Circuit has set forth the framework for assessing the voluntariness of releases of claims. See Adams v. Philip Morris, 67 F.3d 580, 583 (6th Cir. 1995). Under that standard, in evaluating whether a release was "knowingly and voluntarily executed," the Court must look to:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether she had an opportunity to consult with an attorney; (3) the clarity of the waiver; (4) consideration for the waiver; and (5) the totality of the circumstances.

Id. The parties cite a handful of additional cases in support of their respective arguments. The VUMC Defendants rely on Kinnard v. Shoney's, Inc., 100 F. Supp. 2d 781, 792 (M.D. Tenn. 2000), aff'd, 39 F. App'x 313 (6th Cir. 2002). There, this District found that "certain economic pressure and . . . legitimate concerns about [the plaintiffs'] economic future . . . . [were] not sufficient to constitute economic duress," especially because the plaintiffs had had 17 months to consider the agreement. Id. Similarly, in Davenport v. Home Fed. Bank of Tenn., F.S.B., 1994 WL 287591, at *4 (Tenn. Ct. App. June 30, 1994), a case on which Kinnard relies, the Tennessee Court of Appeals court found that the plaintiff, who allegedly signed a release "as a matter of economic survival" was not under duress, despite "legitimate fears as to his future economic well-

11

being," because, among other reasons, he had had almost three months to ponder the merits of the release. Accord Adams, 67 F.3d at 580 (finding that "financial pressure and economic hardship" does not by itself rise to the level of economic duress)). The Kinnard court further distinguished a case in which the plaintiff was given ten minutes to sign, without the advice of counsel. See id. Dr. Hoedt, on the other hand, relies on Rainey v. Rainey, 795 S.W.2d 139, 147 (Tenn. Ct. App. 1990). There, the Tennessee Court of Appeals found that the plaintiff, who was given the choice between "immediately sign[ing]" a deed granting an interest in half of his farm without consulting an attorney or losing the entire farm through foreclosure, had acted under financial duress. See id.

While the Court finds the above opinions instructive, it notes that none was decided on a motion to dismiss. Rather, most were issued at the summary judgment stage, and thus considered under a different standard. Cases in which courts have tested the sufficiency of allegations of economic duress under Tennessee law at this stage of proceedings are few and far between. For instance, in Chambers, this District allowed allegations of duress to survive a Rule 12(b)(6) motion where the plaintiff allegedly agreed to mediation and signed a mediation agreement to avoid losing medical benefits and income necessary to continue her cancer treatment. 2013 WL 652535 at *3. In Avery Outdoors v. Peak Rock Cap, the court found allegations that time was of the essence, that valuable rights were at stake, and that the plaintiff did not act voluntarily to be sufficient to establish economic duress. See 2016 WL 10519035 (W.D. Tenn. Aug. 3, 2016) at *3. In Myers v. Peoples Bank of Ewing, on the other hand, the court found allegations that the defendant threatened to pursue a legal remedy unless the plaintiff signed the agreement insufficient to establish economic duress. 2012 WL 3288179 (E.D. Tenn. Aug. 10, 2012) at *6; accord Flynt Eng'g Co. v. Cox, 99 S.W.3d 99, 102 (Tenn. Ct. App. 2002) (opining that the "intention to pursue

a legal remedy is not ordinarily economic duress, and to do what one has a legal right to do is insufficient to create duress" (citations omitted)).

Here, the FAC alleges that Dr. Hoedt's career, "for which he had spent years in training," was at stake. (See Doc. No. 29 ¶¶ 32, 34, 60 (mentioning "career ending" consequences), ¶ 66 (mentioning the "destruction" of Dr. Hoedt's career)). The FAC further alleges that Dr. Hoedt was presented with a choice between undergoing a hearing, which could have "ruined" his career, or accepting the Settlement Agreement. (See id. ¶ 34). The FAC describes this hearing as "expensive," and further alleges that both the hearing officer and the medical review committee had been "unilaterally selected by VUMC," as allowed by VWCH's bylaws. (Id. at 32.). Based on these allegations, the Court construes the alleged duress as a mere threat of lawful legal action by VUMC and fear for Dr. Hoedt's future economic well-being, insufficient to establish economic duress.

The Court acknowledges that the FAC alleges that the events leading to the hearing and mediation were unlawful. The Court also acknowledges that the FAC alleges that VUMC had previously attempted to obtain a release in exchange for talking to a prospective employer. (See id. ¶ 33). But the FAC's allegations of duress are not grounded based on these wrongs, which, per the FAC's timeline, had already occurred. Rather, the FAC alleges that Dr. Hoedt signed the Settlement Agreement to avoid a hearing allowed by VWCH's bylaws. (See id. ¶¶ 28, 34 ("Dr. Hoedt was under extreme economic and professional duress to avoid a hearing that had all the markings of futility")). The Court also notes that Dr. Hoedt was represented by counsel. (See Doc. No. 29 ¶ 28). And while the FAC is silent on how long Dr. Hoedt was able to consider its terms, the Settlement Agreement states that the final round of mediation lasted from September 2, 2022, to September 8, 2022. (See Doc. No. 1-2 at 1). Therefore, Dr. Hoedt had almost a week to

reflect. Finally, the FAC contains language indicating that Dr. Hoedt considered the terms of the Settlement Agreement and made a rational decision to be bound by them. (See Doc. No. 29 ¶ 34 (stating that Dr. Hoedt agreed to the proctoring arrangement because he was "confident in his abilities").[9] The only elements potentially pointing towards duress are the ambiguity of the Settlement Agreement's release, insofar as its scope is unclear (see generally infra, Section III.A.2.), and the allegation that counsel for VUMC drafted the Agreement. (See Doc. No. 29 ¶ 31). But, without more, these allegations are insufficient to establish economic duress.[10]

Because the FAC fails to allege economic duress, the Court will examine the VUMC Defendants' arguments based upon the terms of the Settlement Agreement.

### 2. Terms of the Settlement Agreement

The parties disagree on whether the terms of the Settlement Agreement bar Dr. Hoedt's claims. As a preliminary matter, the Court notes that the Settlement Agreement unambiguously provides that the applicable law is that of Tennessee. (See Doc. No. 1-2 at 3). The Court will therefore construe the Settlement Agreement under Tennessee law.

---

[9] Although the parties did not raise this issue, Dr. Hoedt's performance under the Settlement Agreement may have amounted to a ratification. See Cumberland, 936 F.2d at 850 ("where the contract is a Waiver and Release, the releasor who retains the consideration after learning that the agreement is voidable has effectively ratified the release and may not later avoid its terms"); see also DiRose v. PK Mgmt., 691 F.2d 628, 633 (2d Cir. 1982) (operating under an agreement, allegedly entered into under economic duress, for multiple months, amounted to a ratification of said agreement).

[10] The VUMC Defendants also argue that the Settlement Agreement itself states that the parties entered into it pursuant to their free will. (See Doc. No. 34 at 16–17; Doc. No. 43 at 4–5). While the Court does not need to reach this argument, it notes that it is tautological. Indeed, it flows from logic that the provision stating that the parties did not contract under duress would also have been entered into under duress. Put differently, contractual language cannot cure an upstream defect in contract formation.

14

"When a contract is unambiguous, a court may determine the interpretation on a motion to dismiss as a matter of law, but when a contract is ambiguous, a court should not interpret the contract at the motion to dismiss stage." Nashville Underground v. AMCO Ins. Co., 523 F. Supp. 3d 1006, 1011 (M.D. Tenn. 2021); Thunder Roads Mag./Thunder Publ'g v. Smith, 2023 WL 8532696, at *7 (M.D. Tenn. Dec. 8, 2023) (same). Rather, "[i]n reviewing a Rule 12(b)(6) motion to dismiss, 'the Court . . . must resolve all ambiguities in the contract in Plaintiffs' favor.'" Id. (quoting Ajuba Int'l. v. Saharia, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012)); Thunder Roads Mag./Thunder Publ'g, 2023 WL 8532696 at *7 (same). Contractual language is ambiguous when the language is "susceptible to more than one reasonable interpretation." Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 890 (Tenn. 2002); Allmand v. Pavletic, 292 S.W.3d 618, 630 (Tenn. 2009) ("If the contractual language is clear and unambiguous, the literal meaning controls; however, if the words are ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language."); accord Thunder Roads Mag./Thunder Publ'g, 2023 WL 8532696 at *7 n.15 ("to say that language is unambiguous is to say that there is no reasonable basis for disagreeing as to its meaning"). Put differently, "[a] contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." Empress Health & Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 191 (Tenn. 1973).

Accordingly, to rule on VUMC's Motion and the parties' respective arguments, the Court must first determine whether the Settlement Agreement is unambiguous. If so, the Court must determine whether its unambiguous meaning supports the VUMC Defendants' arguments. If not,

the Court must decline to interpret the contract at this stage and deny VUMC's Motion. See

Thunder Roads Mag./Thunder Publ'g, 2023 WL 8532696 at *7.

In relevant part, the Settlement Agreement states:

13. For and in consideration of the mutual promises contained in this Agreement, **Dr. Hoedt hereby fully and forever releases Vanderbilt University Medical Center, Vanderbilt University Medical Center d/b/a Vanderbilt Wilson County, and their** officers, executives, directors, **agents**, attorneys, advisors, medical staff, committee members, panel members, and participants in the due process proceedings, and employees, and any and all parties, firms, or persons or entities in privity with them, including predecessors, successors, and affiliates, whether or not identified by name ("Hospital Released Parties"), **of and from any and all causes of action and claims**, damages, or demands for expenses, mental anguish, adverse financial or business consequences and liability of any nature whatsoever, whether known or unknown, under common law or any statute or constitutional law of this or any other state, **that Dr. Hoedt has, had, or may have, on account of or in any way growing out of the VWCH medical staff, peer review and/or quality improvement process regarding Dr. Hoedt, except for breach of this Agreement**. The parties agree that this Agreement is supported by contemporaneous, fair, and legally sufficient consideration, including, but not limited to, the forbearance of legal remedies.

. . . .

15. In further consideration of the mutual releases set forth herein, **the parties**, on behalf of themselves, their successors and assigns, do hereby covenant and **agree that they will not** institute or otherwise **bring suit** or cause or assist any other person or entity to bring suit **against the other party arising out of or relating to the subject of this Agreement so long as that other party is in compliance with this Agreement**.

16. Each party shall bear all attorneys' fees and costs of its own counsel in connection with the claims released herein, the matters and documents referred to herein, and all related matters arising out of or relating to the dispute in this Agreement except to the extent that the opposing parties fails [*sic*] to comply with this Agreement. **In the event that one of the parties fails to fully comply with this Agreement, the other parties shall be entitled to all** reasonable attorneys' fees, expenses, court costs, and **remedies allowed for under this Agreement and the law**.

17. As part of the consideration for the aforementioned mutual releases, the parties expressly represent and warrant they are legally authorized to execute this instrument and have the power and authority to compromise and settle the claims and matters released herein. **The parties warrant and agree that the release set**

16

**forth hereinabove is a general release of all claims held by either party** and further
expressly waive and assume the risk  of any and all claims for damages which exist
as of this date but of which they do not know or expect to exist, whether through
ignorance, oversight, error, negligence or otherwise, and which, if known, would
materially affect either party's decision to enter into this Agreement.

(Doc. No. 1-2 ¶¶ 13, 15–17 (emphasis added)).

Pursuant to the parties' briefing, the Court must make two determinations based on the

above language.  The first is whether the Settlement Agreement allows claims by one party against

the other in case of breach.  (See Doc. No. 34 at 7–14; Doc. No. 40 at 3–4; Doc. No. 43 at 2–4).

The second is whether the Settlement Agreement contains a general release.  (See Doc. No. 34 at

6–10).

i.  Breach of the Settlement Agreement by VUMC

Relying on paragraph 16 of the Settlement Agreement, Dr. Hoedt contends that the

Settlement Agreement allows a party to bring suit in case of breach by the other party,

notwithstanding the release.  (See Doc. No. 40 at 3–4).  After a careful review of the Settlement

Agreement, the Court finds that the language of paragraph 16 is ambiguous in two aspects.  First,

it is unclear whether it merely allows the non-breaching party to seek remedies for attorneys' fees

and costs, or for any remedy for breach, or both.  Second, it is unclear whether the provision allows

the non-breaching party to bring suit for breach of the Settlement Agreement only or also for claims

released therein.  The Court notes that paragraph 15 of the Settlement Agreement also contains

relevant language, which could reasonably be construed as allowing the non-breaching party to

bring a claim  "relating to the subject of this Agreement," which the Court easily finds to be, in

relevant part, the suspension of Dr. Hoedt's privileges at VWCH, the hearing requested by Dr.

Hoedt, the proctoring program, the submission of a revised report to the NPBD, and the peer-

review and/or quality review process.  (See generally Doc. No. 1-2).  As stated above, the Court

must resolve these ambiguities in Dr. Hoedt's favor at this stage.

17

In their Reply, the VUMC Defendants argue that Dr. Hoedt cannot claim that the Settlement Agreement is unenforceable and, at the same time, seek to enforce it. (See Doc. No. 43 at 2–3). But, as the Court understands it, Dr. Hoedt's argument (although not entirely clear) is not that the entire Settlement Agreement is unenforceable in case of breach. Rather, Dr. Hoedt appears to argue that the terms of the Settlement Agreement allow the non-breaching party to sue notwithstanding the release. The Court finds this to be a reasonable interpretation at this stage.

Next, the Court must determine whether FAC adequately states a breach of the Settlement Agreement by VUMC. To answer this question, the Court must look at Count IV. There, the FAC alleges that VUMV breached the Settlement Agreement's non-disparagement and "minimal language" provisions. (See Doc. No. 29 ¶¶ 68–71). These provisions read:

> 11. The Hospital and Dr. Hoedt agree that minimal language (dates of privileges, dates of proctoring, referral to revised NPDB report) will be used in response to credentialing inquiries from the military and/or another hospital or credentialing entity regarding Dr. Hoedt's medical staff privileges.
>
> 12. [. . . .] Further, each party agrees not to make any disparaging remarks against the opposing party regarding any of the bases or contents of this Confidential Settlement Agreement.

(Doc. No. 1-2 at 2–3). In relevant part, the FAC alleges that:

> "Dr. Hoedt has had success in obtaining interviews and on a number of occasions had written contracts drafted for his employment and oral offers made just to have them rescinded following conversations with orthopaedic surgeons at VUMC. On some of those occasions he was specifically informed that comments from Drs. Wrights and Polkowski were such that the potential employers did not want to enter into an employment arrangement with him. It is clear from these circumstances that Drs. Wright and Polkowski and perhaps others within the VUMC Department of Orthopaedic Surgery had violated the terms of this Settlement Agreement and discovery will bear that out."

(Doc. No. 29 ¶ 69). The FAC further alleges that "Drs. Wright and Polkowsi and perhaps others within VUMC" have made "defamatory statements" about Dr. Hoedt. (Id. ¶ 70). Drawing all

reasonable inferences in favor of Dr. Hoedt, the Court finds that these allegations suffice to state a claim of breach of the Settlement Agreement.

Thus, the Court must reject the VUMC Defendants' argument that the Settlement Agreement bars Dr. Hoedt's claims, at least at this stage. Accordingly, Count I will remain pending.

ii.    Scope of the Settlement Agreement's Release

Although the Court has already determined that the Settlement Agreement does not bar the FAC's claims at this stage, the Court will determine whether it contains a general release for ruling on other aspects of VUMC's Motion.

Citing paragraphs 13 and 17, the VUMC Defendants argue that of the Settlement Agreement contains a "general release" of all claims grounded upon events that occurred before the execution thereof. (See Doc. No. 34 at 10). Under Tennessee law, which the parties elected as governing the Settlement Agreement, "[a] general release covers all claims between the parties which are in existence and within their contemplation; a release confined to particular matters or causes operates to release only such claims as fairly come within the terms of the release." Cross v. Earls, 517 S.W.2d 751, 752 (Tenn. 1974). After a careful review of the Settlement Agreement, the Court finds its language is ambiguous, and therefore cannot support the VUMC Defendants' interpretation at this stage. Indeed, paragraph 17 states that the parties "agree that the release set forth hereinabove is a general release of all claims held by either party[.]" But paragraphs 13 and 15, i.e., "the release set forth hereinabove," expressly confine the release to matters relating to "the VWCH medical staff, peer review and/or quality improvement process" and "the subject of this Agreement," respectively. Therefore, the language of paragraph 17 is in direct contradiction with that of paragraphs 13 and 15. As a result, the Court can only guess whether the parties were unaware that "general release" is a term of art under Tennessee law, or whether the parties intended

19

to agree to a general release but accidentally drafted conflicting terms. As such, at this stage, the Court cannot find as a matter of law that the Settlement Agreement is a general release.

## B. Inducement to Breach of Contract (Count III)

The FAC alleges that Drs. Wright and Polkowski induced VUMC's alleged breach of the Employment Agreement. (See Doc. No. 29 ¶ 22). The VUMC Defendants argue that the "inducement claim fails because [Dr. Hoedt] unambiguously released the right to pursue such a claim when he entered the Settlement Agreement with VUMC and VWCH." (Doc. No. 34 at 13). Specifically, the VUMC Defendants argue that the Settlement Agreement contains a general release, which includes claims against Drs. Wright and Polkowski as employees of VUMC and participants in the proceedings at VWCH. (See id. at 13–14).

The Court finds that the paragraph 13 of the Settlement Agreement applies to Drs. Wright and Polkowski as "agents" or "employees" of VUMC, or (as least for Dr. Wright) as "participants in the . . . proceedings." But, as discussed above, the Court cannot find at this stage that the Settlement Agreement contains a general release, insofar as conflicting terms render the operative language ambiguous. (See supra, Section III.A.2.ii). Therefore, the Court must reject the VUMC Defendants' argument. Count III will remain pending.

## C. Breach of the Settlement Agreement (Count IV)

For the reasons stated above (see supra, Section III.A.2.ii), Count IV will remain pending.

## IV. VU'S MOTION

VU has moved to dismiss Count II, which is the sole claim against it. For the reasons stated below, the Court will grant VU's Motion.

## A. Breach of the Employment Agreement (Count II)

VU makes three arguments in support of its Motion. First, it argues that the FAC fails to allege the breach of a contractual obligation by VU. (See Doc. No. 39 at 11–13). Second, it argues

that the FAC fails to sufficiently allege that Dr. Hoedt filed his grievances in a timely manner and with the appropriate committee. (See id. at 14–17). Third, it argues that the FAC does not allege damages. (See id. at 17–20). The Court will address these arguments in turn.

1. Breach of a Contractual Obligation

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." Kryder v. Est. of Rogers, 296 F. Supp. 3d 892, 908 (M.D. Tenn. 2017) (quoting Ingram v. Cendant Mobility Fin., 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006)). "To prevail on any breach of contract claim, the plaintiff must prove all elements." Id. (quoting Hampton v. Macon Cty. Bd. of Educ., 2014 WL 107971, at *9 (Tenn. Ct. App. 2014)); accord Parker v. Magna Seating of Am., 2022 WL 2116045, at *3 (6th Cir. Apr. 14, 2022).

Here, VU argues that the FAC fails to set forth allegations that would support the second element, insofar as the FAC does not set forth a contractual obligation that VU could have breached. Specifically, VU contends that the Faculty Handbook does not require anything more than "a decision," which VU rendered when rejecting Dr. Hoedt's grievances as untimely. (Doc. No. 39 at 11–13; Doc. No. 53 at 1–3). In response, Dr. Hoedt mostly relies on unpled theories of liability as well as conjectures and facts outside of the pleadings.[11] (See Doc. No. 49 at 8–12). Nonetheless, recentering the analysis on the allegations in the pleading, the Court is able to discern that the FAC alleges VU breached the Employment Contract by failing to comply with Part IV of the Faculty Handbook. (See Doc. No. 29 ¶¶ 58–64). Specifically, the FAC alleges that Dr. Hoedt

---

[11] For instance, Dr. Hoedt argues that VU breached the covenant of good faith and fair dealing, but the FAC does not expressly mention or otherwise articulate this theory in a cognizable fashion, at least not against VU. And a party may not "set forth unpled claims through a response to a motion to dismiss." Morris v. Equi First, 2011 WL 1337404, at *6 (M.D. Tenn. Apr. 7, 2011), report and recommendation adopted, 2011 WL 1884602 (M.D. Tenn. May 18, 2011) (collecting cases).

filed his grievance under Part IV, Chapter 2, Section B of the Handbook, which establishes a grievance process available to:

> a faculty member who believes that the University has breached an obligation owed to the faculty member, including but not limited to an obligation to adhere to: (a) express or implied terms of a faculty member's contract, including relevant portions of the Faculty Manual; (b) commonly accepted norms of professional responsibility and academic freedom; (c) stated or commonly understood standards of fair and reasonable procedures; and (d) legal obligations with respect to nondiscriminatory treatment on the basis of race, sex, or other prohibited factors.

(Id. ¶ 58). Among other formal requirements, the Handbook provides that:

> [i]f a faculty member chooses to file a formal grievance, the grievance must be transmitted in writing to the chair of the Grievances Committee within sixty days after the grievant becomes aware of the action forming the basis of the grievance.

(Doc. No. 1-4 at 80). Upon the proper submission of a grievance, the Handbook provides that VU's grievance committee must take the following actions:

> On receipt of a grievance, the Grievances Committee will convene to determine whether the grievance presents a good faith, nonspurious claim of breach of obligation by the University or its representatives. In reaching its determination, the Grievances Committee may rely on the written request of the faculty member and the supporting documents, or may decide to hold a preliminary hearing to explore the matter further. The Grievances Committee, at this stage, will consider the statements or allegations of the faculty member in their most favorable light in order to determine whether the statements or allegations, if proven in a hearing, would establish a breach by the University of an obligation owed to the grievant.
>
> The Grievances Committee will apply the following standard in making an initial determination about whether the grievant has presented a good faith, nonspurious claim: 'Under the procedures adopted by the Grievances Committee, in implementation of its duties under the Faculty Manual, the Committee must determine at the threshold, first, whether allegations in the grievance taken in their most favorable light, if proven, would constitute a breach of an obligation owed to a faculty member as described in the Faculty Manual. If the answer to that question is yes, then the Committee must next determine, from the evidence presented, whether the grievant has a reasonable prospect of being able to prove the allegations made in the grievance. If the answer to both questions is yes, the Committee will establish a process for a further investigation of the grievance.'

The faculty member presenting a grievance shall have a written reply by the chair of the Grievances Committee within a reasonably prompt time, in which the Grievances Committee's plan of action shall be outlined.

The Grievances Committee shall review the case to assure that the University's actions were procedurally and substantively sound. The University representative whose actions form the basis of the complaint shall be asked to respond to the grievance in writing, briefly explaining their/her/his position on each major element of the complaint. In addition, the University representative shall be asked to supply in a timely manner any supporting documents not previously filed by the grievant. The Grievances Committee Chair shall provide a copy of the response(s) to the grievant. Each party to the grievance shall be asked to indicate whether they/she/he wishes to appear before the Grievances Committee to add to or explain the written record in the case. If such an appearance is requested, it will be scheduled at an appropriate point in the Grievances Committee's inquiry. In addition, the Grievances Committee may on its own initiative request that either party appear to answer questions and may request the presence of witnesses.

(Id. at 80–81). Based on the above language, the Court finds that the FAC sufficiently alleges that VU was contractually obligated to take certain steps in response to a properly submitted complaint, beyond simply determining whether the grievance was properly submitted.[12] Put differently, the FAC plausibly alleges that VU's dismissal of a timely grievance as untimely could constitute a breach of the Employment Agreement. Accordingly, whether "a decision" on the timeliness of his grievance is all that Dr. Hoedt was entitled to depends on whether the grievance was timely and otherwise properly submitted. The Court will address this issue next.

    2.   Timeliness and Filing with the Appropriate Committee

VU argues that the FAC "fails to adequately allege that [Dr. Hoedt's] grievances were timely filed with the appropriate committee[.]" (Doc. No. 39 at 14–17). As for timeliness, VU argues that "because [Dr, Hoedt's] grievances arose from his March 17, 2022, suspension, he needed to submit a written grievance on or before May 16, 2022, for it to be timely." (Id. at 16–

---

[12] Because the Handbook clearly sets forth the specific steps that VU must take in response to a grievance, the Court finds the present case distinguishable from cases in which a different handbook was found to contain no tangible requirements. (See, e.g., Doc. No. 39 at 11 (citing Evans v. Vanderbilt Univ. Sch. of Med., 589 F. Supp. 3d 870, 886 (M.D. Tenn. 2022)).

17; see also Doc. No. 53 at 4–5). Dr. Hoedt counters that the July 15, 2022, grievance was timely because "[i]t was not until the failed mediation on June 23, 2022, that Dr. Hoedt became aware of the lengths VUMS, Wright, and Polkowski were going to ruin his career." (Doc. No 49 at 4–5); accord Doc. No. 29 ¶ 60 (same)). Although the FAC's relevant allegations are sparse, the Court finds that the FAC sufficiently alleges that Dr. Hoedt's July 15, 2022, grievance was timely. Indeed, the FAC does not state what the exact basis for Dr. Hoedt's grievance was; nor does it conclusively state that its sole basis was the March 17, 2022, suspension. Still, the FAC at least implies that Dr. Hoedt was unaware of said basis until June 23, 2022. (See Doc. No. 29 ¶ 60). And that is all the Handbook requires. (See Doc. No. 1-4 at 80 ("the grievance must be transmitted in writing to the chair of the Grievances Committee within *sixty days after the grievant becomes aware* of the action forming the basis of the grievance") (emphasis added)).

In sum, the FAC states that Dr. Hoedt filed a grievance based upon facts that he discovered on June 23, 2022, and that VU impermissibly rejected this grievance as untimely less than 60 days later. The Court finds that this is sufficient to state a claim for breach of the Employment Agreement at this stage. While VU understandably laments the FAC's "lack of clarity" on the contents of the grievance (see Doc. No. 39 at 15–16), the Court is aware of no authority that would require the FAC to plead such details. In the absence of such details in the FAC, any argument based thereon will have to wait for summary judgment. See Am. Addiction Centers, Inc. v. Nat'l Ass'n of Addiction Treatment Providers, 515 F. Supp. 3d 820, 836 (M.D. Tenn. 2021) (factual assertions contradicting a pleading cannot be considered on a motion to dismiss).

A similar rationale applies to the "additional [g]rievance" Dr. Hoedt allegedly filed on November 21, 2022, as well as the "[l]engthy written . . . complaints" that Dr. Hoedt allegedly

submitted "through November of 2022."[13]  (See Doc. No. 29 ¶ 61).  The FAC alleges that the basis

for these grievances were the "unethical and fraudulent behavior of Wright, Polkowski and the

blatant violation of VU's policies" as well as "efforts to have Dr. Hoedt's VWCH hospital

privileges revoked to obtain a termination of his VUMC employment and VU faculty

appointment," which according to the FAC, were "still ongoing" at the time Dr. Hoedt filed the

grievances.  (Id. ¶ 61).  Drawing all inferences in favor of Dr. Hoedt, the Court finds that these

scanty allegations at least imply that the grievances filed in November were based on actions that

Dr. Hoedt had just discovered.  And the Court may not question the veracity of the FAC's

allegations at this stage.  See Am. Addiction Centers, 515 F. Supp. 3d 820 at 836.

Finally, VU points to contradictory allegations in the FAC.  (See Doc. No. 39 at 14–15).

Specifically, the FAC states that Dr. Hoedt submitted his July 15, 2022, grievance pursuant to Part

IV, Chapter 2, Section B of the Handbook.  (See Doc. No. 29 ¶ 58).  Yet, the FAC also states that

"[t]he Grievance fully informed *the ad hoc committee* of the unethical and fraudulent behavior of

Wright and Polkowski, including the blatant violation of VU's policies[,]"  (Id. (emphasis added)).

In the same vein, the FAC alleges that VU breached thee Employment Agreement because "*[t]he

ad hoc committee* erroneously interpreted the Faculty Handbook in an obvious effort to sweep the

egregious behavior of Wright, Polkowski, and others on the faculty of the Vanderbilt School of

Medicine under the rug."  (Id. ¶ 64 (emphasis added)).  But, per the plain language of the

Handbook, ad hoc committees review grievances filed under Section A, not Section B.  (See Doc.

_____

[13] The FAC mentions both grievances and "complaints."  Drawing all inferences in favor of Dr.
Hoedt at this stage, and in the absence of any explanation or definition, the Court will construe the
term "written . . . complaint" as describing a written grievance as provided for in the Handbook.
The Court also notes that FAC mentions "oral complaints."  (See id.).  Because the Handbook
requires grievances to "be transmitted in writing" (see Doc. No. 1-4 at 80), the Court will not allow
Dr. Hoedt to premise its breach of contract claim on such oral complaints.

1-4 at 83). The body that reviews grievances filed under Section B is the "Senate Committee on Grievances" or the "Grievances Committee." (See id. at 85–86).

Despite this inconsistent terminology, the Court is inclined to understand the allegations as the mere result of sloppy pleading rather than underlying irreconcilable contradictions. And sloppy pleading is not necessarily a sufficient basis for dismissal, especially when the pleading otherwise states a claim. See, e.g., Hephner v. Menard, Inc., 2021 WL 4441589, at *2 (N.D. Ohio Sept. 28, 2021) (where the pleading otherwise stated a claim, refusing to dismiss a claim based on an error induced by sloppy pleading); Dero Roofing, LLC v. Triton, Inc., 2023 WL 1781512, at *3 (M.D. Fla. Feb. 6, 2023) (same). The Court also notes that the FAC alleges in another paragraph that VU breached the Employment Agreement because "*the VU faculty committee* dismissed Dr. Hoedt's complaints as being untimely, in violation of the policies and procedures outlined in VU's Faculty Handbook." (Doc. No. 29 ¶ 63 (emphasis added)). This additional inconsistency in terminology with respect to what body rejected the grievances as untimely comforts the Court in its finding that the allegations are merely sloppy rather than contradictory to the point of warranting dismissal. Drawing all inferences in favor of Dr. Hoedt, the Court therefore finds that the FAC plausibly alleges that Dr. Hoedt filed grievances pursuant Part IV, Chapter 2, Section B of the Handbook, and that VU rejected the grievances as untimely.

For these reasons, the Court rejects VU's arguments that the allegations in the FAC show that grievances were untimely and/or not filed with the appropriate committee.

3. Failure to Allege Damages

Next, VU argues that the FAC fails to allege damages caused by VU's alleged breach of contract. (Doc. No. 39 at 17–20; Doc. No. 53 at 5–6). The Court agrees.

Indeed, after a careful review of the FAC, the Court was able to identify only two relevant allegations pertaining to damages. The first allegation is:

Had VU acted appropriately upon Dr. Hoedt's original Grievance and the amendment to the additional Grievance sent on November 21, 2022, this process would have been halted and the NPDB issues that still exist and are part of this complaint would have been resolved.

(Doc. No. 29 ¶ 64). The second allegation, which appears under the FAC's "damages" header, is:

As a direct and proximate result of one or more of the above acts of fraudulent conduct, breach of contract, inducement to breach contract, breach of a settlement agreement, and violations of federal law, Dr. Hoedt suffered damages, including but not limited to, loss of income, loss of employment opportunities, damages to his reputation, and attorneys' fees.

(Id. ¶ 78).

As for the first allegation, VU correctly points out that the FAC fails to identify which "process would have been halted." (See Doc. No. 30 at 19). Indeed, despite the FAC's use of the demonstrative pronoun "this," the Court is unable to identify which "process" the FAC refers to. Even assuming, *arguendo*, that said "process" could be the proctoring arrangement at VUMC, the peer-review process at VUMC (which the FAC does not describe), or the NPDB's dispute resolution process, the FAC contains no allegations that could support the conclusory statement that VU could have "halted" any such process by not rejecting Dr. Hoedt's grievances as untimely.

The Court also agrees with VU that the FAC is entirely devoid of factual allegations that could show VU's alleged breach of the Employment Agreement contributed to cause or could have "resolve[d]" "the NPDB issues that still exist and are part of this complaint." Drawing all inferences in favor of Dr. Hoedt, the Court construes the term "issue" as referring to the reports that VUMC and VWCH filed with the NPDB. But the FAC does not allege that VU had anything to do with these third-party reports; nor does it explain how VU could have stopped the reporting by not rejecting Dr. Hoedt's grievances as untimely. In his Opposition, Dr. Hoedt cites a portion of the Handbook stating that VU and VUMC "will coordinate actions whenever matters affecting both are involved." (See Doc. No. 29 at 4, 6). On this basis, Dr.Hoedt argues that "[a]n appropriate coordination of actions between VU and VUMC could have [removed the NPDB reports] after Dr.

27

Hoedt's privileges at VWCH were restored." (Id. at 7). Besides that the FAC does not articulate this theory whatsoever, the Court finds that the existing allegations do not support the inference that NPDB reporting could have been a "matter[] affecting" VU. Indeed, the FAC alleges that VUMC and VWCH filed the reports, not VU. (See Doc. No 29 ¶ 39). Moreover, the FAC alleges that VU had a right to terminate the Employment Agreement if his clinical privileges were restricted or terminated. (See id. ¶ 54). Per the FAC's allegations, it is therefore the underlying restriction or termination that could have affected the Employment Agreement between Dr. Hoedt and VU, not the reporting thereof to the NPDB. Finally, nowhere does the FAC allege that VU had the authority to remove or force VUMC to remove the report. In the same vein, the FAC does not allege that VU and VUMC are affiliated, or that VUMC acted as VU's agent. Further, the FAC acknowledges that reporting is regulated by the Healthcare Quality Improvement Act and related Guidelines, which implies that it is not entirely discretionary. (See id. ¶¶ 40, 42; accord Doc. No. 39 at 19 (citing 42 U.S.C. § 11133(a)); Doc. No. 53 at 6 (same)). As such, the Court finds that the FAC fails to allege damages related to NPDB reporting in connection with VU's alleged breach of the Employment Agreement.

As for the second allegation, the FAC lumps together damages without connecting them to the various defendants. (See Doc. No. 29 ¶ 78 ("As a . . . result of one or more of the above acts . . . , Dr. Hoedt suffered damages, including but not limited to, loss of income, loss of employment opportunities, damages to his reputation, and attorneys' fees."). Courts have found similar deficiencies to warrant dismissal under Rule 12(b)(6). See, e.g., Lewis v. City of Lawrence, 2020 WL 1446868, at *4 (D. Kan. Mar. 25, 2020) (dismissing claim where the "[p]laintiff fail[ed] to adequately connect his legal claims (including damages) to his factual allegations as to each defendant"). In his Opposition, Dr. Hoedt specifies that the damages attributable to VU stem from

28

his inability to practice medicine. (See Doc. No. 49 at 6 ("because he was prevented from performing surgeries or practicing medicine[,] he lost income and his career was being significantly damaged."); accord id. at 13 ("As to the claim for damages, Dr. Hoedt has alleged that he has lost income, which the inability to perform surgeries and practice medicine under the forced Settlement Agreement has caused.")). But just as with the NPDB reporting, the FAC fails to plausibly allege that VU, by not rejecting Dr. Hoedt's grievances as untimely, could have restored Dr. Hoedt's medical privileges at VWCH or changed the terms of the Settlement Agreement, to which VU was not a party. (Cf. Doc. No. 1-2 at 4–6 (VU not a party to the Settlement Agreement)). And as VU correctly points out (see Doc. No. 39 at 19–20; Doc. No. 53 at 5), Dr. Hoedt "was paid by VU/VUMC his base salary" under the Employment Agreement. (Doc. No. 49 at 6). Without more, the FAC fails to allege damages attributable to VU's alleged breach.

In sum, the Court finds that the FAC fails to allege damages in connection with VU's alleged breach. As such, the FAC fails to state a claim for breach of the Employment Agreement against VU. See Kryder v. Est. of Rogers, 296 F. Supp. 3d 892, 908 (M.D. Tenn. 2017) (damages caused by the breach are an essential element of a breach of contract claim) (citing Ingram v. Cendant Mobility Fin. Corp., 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006)); Ervin v. Nashville Peace & Just. Ctr., 673 F. Supp. 2d 592, 612 (M.D. Tenn. 2009) ("Plaintiff's state law breach of contract claim warrants dismissal because he cannot show damages from the purported breach."); Peoples v. Bank of Am., 2012 WL 601777, at *6 (W.D. Tenn. Feb. 22, 2012) (granting 12(b)(6) motion in breach of contract case because the plaintiff failed to allege damages). Accordingly, Count II will be dismissed.

## V. CONCLUSION

For the foregoing reasons, the VUMC Defendants' Partial Motion to Dismiss (Doc. No. 33) will be denied. VU's Renewed Motion to Dismiss or, in the Alternative, for a More Definite Statement (Doc. No. 38) will be granted. Because the FAC brings no claim against him, Defendant Becerra will be dismissed.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE